BENJAMIN C. ADAMS *v.* WILLIAM E. JOHNSON, President, etc.

1. MORTGAGE: AGREEMENT TO EXECUTE, AND ACCEPTANCE OF BY MORT-
GAGEE : CASE IN JUDGMENT.—A made an agreement with the Bank of Cam-
den, S. C., by the terms of which the bank was to loan him $50,000 of its
notes to be used by A, and put in circulation in Mississippi ; to secure this
loan A was to execute a mortgage on certain property in Mississippi, both
real and personal, worth in value fifty per cent. more than the sum bor-
rowed, and the security to be approved by Gov. McWillie of Mississippi.
After this agreement was made, at the request of A the bank advanced him
$15,000, as part of the $50,000, and A gave to the bank his bill of exchange,
for that amount and a letter of credit from the drawers of the bill, to secure
the $15,000 and the faithful execution of the mortgage according to the
terms of the agreement. The mortgage, which was subsequently executed

and tendered, was rejected by the bank as unsatisfactory and not in compliance with the original agreement; the bank retaining the mortgage pending further negotiations on the subject. A having failed to provide satisfactory security, the bank declined advancing the remainder of the money and sought to foreclose the mortgage as indemnity for the $15,000 already advanced. Held—That as the mortgage was never accepted by the bank, a decree of foreclosure was erroneous, and that its legal effect was to remit the bank to its security on the bill of exchange and letter of credit.

2. SAME: CHANCERY: SPECIFIC PERFORMANCE.—A court of chancery will not decree a specific performance of an unexecuted contract or re-formation of an instrument not executed according to agreement of parties, where the 'bill is not framed with such an aspect, and fails to show that specific property was contemplated as the basis and subject-matter of the contract.

ERROR to the Chancery Court of Yalobusha county. Hon. William Cothran, chancellor.

The facts sufficiently appear in the opinion of the court.

*Aldridge & Golliday*, for plaintiff in error, contended—

That there was no contract between the parties with reference to the mortgage; that the record shows a want of the elements necessary to make a contract; that the offer made by Adams was not accepted by the bank absolutely—but if at all, with modifications, to which Adams never consented; that such offer on the part of the bank amounted to a rejection of the original proposition; that if Adams failed to comply with the terms of the original agreement about the mortgage, the bank had the right to reject the security tendered; having rejected the mortgage, renders it inoperative for any purposes; that the two notes for $25,000 each and the mortgage were given to secure the bank in the loan of $50,000 to Adams; but the bank, having rejected the security as unsatisfactory, and declined making an advance of the remaining $35,000, cannot claim the mortgage so rejected as security for the $15,000 which had been loaned; that contracts cannot be accepted in part and rejected in part—if accepted, they must be accepted *as tendered, and for the purposes tendered.* Also contended that the decree in the court below was erroneous, because rendered for an amount not ascertainable from any evidence of debt on file, or

other proof made on the trial of the cause, and is too vague and uncertain—makes no disposition of the surplus, should there be any after paying the amount claimed, and does not order the cancellation of the negotiable papers outstanding against the defendant and admitted by complainant to be void. Cited Parsons on Contracts, vol. i. pp. 6, 400, 401; 34 Miss. 742; *Taylor* v. *Richardson*, 2 Story Eq. Jur. §§ 699, 700.

*E. S. Fisher*, for defendant in error, contended that, according to the rules of equity, the decree below was correct, and should be sustained; that the mortgage executed by Adams, although not such as was promised, is available as security to the extent of the benefits he received under that promise; that the failure of Adams to do his duty cannot be set up as defence to his liability to the extent he has gone; that the failure of the bank to advance the balance of the $50,000, could be no protection to Adams, when it clearly appears he had not complied with his part of the agreement—had not performed the condition precedent to his being entitled to it; that the bank was induced to trust him on his promise to furnish the security required, and to advance $15,000, and is entitled to use the mortgage to that extent; that Adams did not obtain the $15,000 on his bill of exchange and letter of credit alone, but as a part of the $50,000 to be loaned under the original agreement, and with the express understanding the whole amount was to be secured by mortgage on real and personal estate, approved by Col. McWillie. If Adams had complied with his contract, he would now be without any defence; and having failed so to comply, cannot profit by his own wrong; that the rights and liabilities of the parties depend upon their undertakings respectively in the original agreement between them, and that Adams cannot shield himself by a fraud or trick in the mode of tendering his security, or by his intention and purposes in making the tender. The full and clear evidence of fraud on the part of the plaintiff in error, as shown by the record, cuts him off from all relief by a court of equity.

*J. A. Snyder* also filed elaborate brief on same side.

Adams v. Johnson.

HANDY, C.J., delivered the opinion of the court.

The defendant in error, as president of the Bank of Camden, South Carolina, filed his original bill in this case, praying the foreclosure of a mortgage executed by the plaintiff in error, for the payment of two promissory notes, each for the sum of $25,000, made by the plaintiff in error to the bank. Subsequently an amended bill was filed, changing, in material respects, the case as made by the original bill, and presenting the matters of controversy which were decided in the court below, and which are here presented for our determination.

The amended bill disclaims all right to recover upon the latter of the two notes for $25,000, and offers to cancel it; and it claims to recover on the former of those notes to the amount of $15,000 only, with interest; and to that extent it claims that the mortgage is a security, and prays a foreclosure and sale of the mortgaged property for the payment thereof.

The pleadings and proofs in the record are voluminous, and are not necessary to be stated in detail. So far as they are material, they present the following state of facts:

It appears that, in the summer of 1857, Adams, who was then engaged in the business of a private banker in this State, proposed to obtain a loan of fifty thousand dollars from the Bank of Camden, in South Carolina, in the notes of that bank, to be put into circulation in this State by him, in his banking business; and that the bank acceded to his proposition upon the following terms—that he should execute to the bank his two promissory notes, each for $25,000, one payable on the 15th of March, 1858, and the other on the 15th of April, 1858, bearing five per cent. interest, payable in New Orleans; which notes were to be secured by mortgage or deed of trust, on property, real and personal, in this State, worth more than fifty per cent. over the amount of the notes, the value of the property and the security to be approved by Gov. McWillie, a friend of the officers of the bank; and Adams was to agree to keep the banknotes to be received by him, and which were to be marked by him, in circulation, by redeeming them, as they should be returned to the bank and sent to him at Grenada, in this State, at

his risk and expense, by his check at sight on New Orleans, at par ; and the mortgage to be so drawn as to protect not only the two notes, but such other advances as the bank might make him, of the same character, as was contemplated to be done from time to time, if found expedient. To these terms Adams consented about 1st September, 1857, while he was in New York, where he was informed of them ; and he then proposed to the bank to let him have $15,000 of the money to take home with him, for which he would leave his drafts on Watt, Noble & Mobley, merchants of New Orleans, with their letter of credit, until the mortgage and notes could be executed on his return home, as agreed on. On or about the 18th September, 1857, the bank acceded to this proposition, advanced him the $15,000, and took his draft for that sum on Watt, Noble & Mobley, with their letter of credit in favor of Adams. Early in October, he transmitted to the bank, through H. W. Conner, its agent at Charleston, a mortgage—that sought to be here foreclosed—on a tract of land in Holmes county, which the agent promptly forwarded to the bank ; and, in a few days thereafter, the president returned the mortgage to Mr. Conner, and stated ·to him that it was insufficient and unsatisfactory, because it covered only lands, instead of lands and personal property, and because there was no certificate of Gov. McWillie of the value of the property contained in it ; both of which particulars were required by the terms the bank had proposed, and which Adams had accepted ; and the agent was instructed to take the papers to Memphis, where Adams was to meet him, and to get the mortgage made to conform to the agreement, or to substitute an additional security, or otherwise to make it safe to the bank in a manner satisfactory to the agent. The agent wrote twice to Adams to meet him at Memphis, but did not find him there. On the 31st October, he met Adams in New Orleans, and proposed to him to arrange the business ; but he replied that it was impracticable then to make any arrangement requiring the payment of money, owing to the commercial crisis then prevailing there and throughout the country ; and nothing was done towards settling it. Nothing further took place in the

business until January, 1858, when the agent met Adams in New Orleans, and proposed to him to take approved acceptances for the $15,000 which he had received from the bank, and to give him up the mortgage and all other security held by the bank, or if he would give a check for the notes received by him and redeemed by the bank, with others of the $15,000 as they should be redeemed by the bank, he could continue to use the amount received by him until the times became better, and a new arrangement could be made for the future, the securities then held by the bank to remain as they were; but he declined to accede to it.

It is distinctly stated, in the answer of the president of the bank to the cross-bill of Adams, that the bank refused to accept the mortgage as a compliance with the engagement of Adams. The witness Conner states, substantially, the same thing; and that, upon receiving the mortgage, the bank referred it back to him to have it corrected or amended, so as to conform to the agreement, or to get other and satisfactory security. The answer of Adams to the amended bill also states that the mortgage was not accepted as a compliance with his agreement, and that the bank refused to treat it as such.

As to the purpose for which the bill of exchange for $15,000 was given to the bank, the amended bill states that after the loan of the $50,000 had been agreed on, Adams desired the bank to advance him $15,000 on the faith of the agreement to execute the notes and mortgage and as part of the $50,000, and offered to place in the hands of the bank the bill of exchange as security and indemnity that he would, in good faith, execute the mortgage according to the agreement; and it admits, in terms, that the bill of exchange was to become inoperative and to be returned to Adams, upon the execution of the mortgage according to the agreement. Adams states, in his answer, that the bill was given to secure the $15,000 advanced to him, until he should execute a satisfactory mortgage for the $50,000. Mr. Conner states, in his deposition, that the bill was left with the bank by Adams, when he received the money, to represent the $15,000, until Adams furnished the bank his mortgage, in ac-

cordance with his agreement; that the mortgage was not in conformity with the agreement, was not satisfactory, and was referred back for amendment and correction; and that the bank, therefore, held on to the bill of exchange until the mortgage should be made satisfactory.

The matter of controversy presented by this record is solely whether the bank is entitled to hold and enforce the mortgage as a security for the bill of exchange for $15,000. And the first question that arises is, whether it was intended by the parties that the bill was to be secured by the mortgage.

Both the pleadings and the proof appear to place this point beyond all possibility of doubt. They all show that the bill was intended to be a distinct security from the mortgage, and a pledge and indemnity for the faithful execution of the mortgage. It was to take effect and be in force, as the security of the bank for the money advanced, in case Adams should fail to execute the mortgage according to the agreement, but to be inoperative and be returned to Adams upon the due execution of the mortgage. This is the explicit admission of the amended bill; and the witness Conner states, that the bank held on to the bill until the mortgage should be made satisfactory, and that it was intended to represent the $15,000, until Adams furnished the bank his mortgage according to the agreement. When the mortgage should be made, the money due by the bill was to be a part of the debt secured by the mortgage, and the bill was to be delivered up to Adams; but until that was done, it was to be an independent security for the debt. Instead, therefore, of the mortgage being a security for the bill, it is plain that the bill was intended to be a security for the due execution of the mortgage, and to become inoperative when the mortgage should be executed. It is clear that the bank was satisfied with the security of the bill and letter of credit for the $15,000 advanced, and that the parties intended that that should be the security for that sum, in the event of failure to execute a mortgage according to the agreement.

The next question is, whether, the money due by the bill being a part of the sum intended ultimately to be secured by

the mortgage, the bank is entitled to hold the mortgage as a security for it, under the circumstances of the case?

It fully appears that the mortgage was not executed according to the agreement of the parties; and it is clear that it was rejected by the bank for non-compliance with the agreement. For it was not only not accepted by the bank, but she refused to carry out the agreement to be performed on her part, by advancing the balance of $35,000, as she would have been bound to do if it had not been rejected upon being tendered. The evidence showing that it was referred back to Mr. Conner for correction or amendment, can only mean that it was rejected by the bank as it stood; and though she did not desire or intend to abandon *the enterprise*, yet she refused to accept the mortgage as offered, and referred it back to Mr. Conner, that it might be made to conform to the agreement, or that he might take such other security as was satisfactory to him; and that the contemplated loan of her money in a remote section of the country, which she considered advantageous, should not fail, nor her security therefor be precarious. It was not corrected or amended, but remained in its original form and condition. If it was not made in compliance with the agreement, the bank had the right to refuse acceptance of it. If she rejected it, the transaction was at an end, and it ceased to have any force or effect whatever; and, in that event, it was not competent for her to hold and treat it as a security for any part of the money embraced in the arrangement with Adams, unless he consented to the modification. Her rejection of it, as a full compliance with the agreement with Adams, absolved him from all obligation under it; for he had the right then to consider it at an end, and it would have required an express consent on his part, after such rejection, to modify its effect, and to render it a partial compliance with the agreement, and a partial security for the money intended to be loaned to him.

But there is no evidence whatever in the record of any such consent on his part; and hence it follows that the mortgage must be considered as at an end.

There is, therefore, no mortgage in existence to stand as a

security for the money advanced; and there being no mort-, gage, the bill and letter of credit constitute the only security which the bank has for the loan of the $15,000, and that security stands in force; because by the terms of the contract it was to constitute the security of the bank, if Adams should fail to execute a mortgage according to the agreement.

If the bill of exchange and letter of credit had not been given, to stand as the security until the mortgage should be given, and the matter had stood merely upon the agreement to execute a mortgage, which Adams had failed to perform in conformity to the agreement, a court of equity might have held the insufficient mortgage tendered to be a security for the money advanced. But this rule cannot apply here, because the mortgage was never accepted, to any extent, by the bank, and no notice was given to Adams that it was, or would be, partially accepted; and, on the contrary, the steps taken by the bank clearly indicate that it was wholly rejected, and the effort was to have it corrected and amended, so as to be fully in accordance with the agreement. The legal effect of this course is to remit the bank to the security of the bill of exchange, which was intended to constitute the security until a due mortgage should be executed; which having failed, the bank is bound by the security which she took and which was to operate as her security in that contingency.

It is insisted, in behalf of the defendant in error, that, inasmuch as the $15,000 was advanced with the understanding, between the parties, that that sum was to be embraced by the mortgage when executed—and which the plaintiff in error wrongfully failed to execute in compliance with the agreement —the mortgage as executed should be enforced and the decree sustained, on the ground that the bank was entitled to a specific performance of the contract, to execute a mortgage. But to this view there are several insuperable objections: 1. The bill is not framed with any aspect of specific performance of an unexecuted contract, or of the re-formation of an instrument not executed according to the contract of the parties. 2. It seeks the enforcement of the mortgage, as validly made, and available

to the bank, and as effectual in partial pursuance of the agreement, and to the extent that property was conveyed by it.    3. If the bill does not seek an enforcement of the mortgage as made in pursuance of the contract, and as a security for the debt to the amount of the money advanced, there does not appear to be any contract to convey any specific property by mortgage, nor that any specific property was contemplated by the parties, and of course the court could not decree a mortgage upon any specific property.    For there does not appear to have been any agreement that any specific property should be conveyed by the mortgage to be executed; and in the absence of any such agreement, the court could not decree a specific performance upon the ground of the right of the bank to have a mortgage upon the original unexecuted agreement of Adams.

It follows, from these views, that the decree extending the mortgage to the bill of exchange, and ordering a foreclosure to the amount thereby secured, is erroneous; and the decree must be reversed, and the bill dismissed.